Ms. Taylor, would you call the case please? 14-0808 Dallas-Newton-Stockton v. Title Insurance And please identify yourselves and tell us who you're representing. For the plaintiff, I'm Steve Tillery. Your Honor, I'm Gordon Tillery. Also, Tom, this is Ed. I'm Bill Thornton. Thanks, Tom. John, I'm Earl Simpson. Thanks, Tom. And good morning, Your Honor. I'm Michael Brody for the Defendant Athlete Cross-Country. And Erica Paul Harris for the Defendant Athlete Cross-Country. All right. Now, you'll notice we had one case on the call this morning. And none of us, having sat together many times, are real sticklers about time. But I would ask you to be judicious about the amount of time that you spend. The microphones that are here are for recording purposes only. They do not amplify, so you need to keep your voices up. And Mr. Tillery, will you be presenting the argument for the plaintiff? I'll be presenting part of the argument, and Mr. Smith will be presenting it as well. Okay. Why don't you tell me how you've divided it up? I will take the initial argument, and Mr. Smith will take half of the rebuttal. I'll be up for a fairly short time. Famous last words. I'm going to go alone, Judge. Okay. And I would suggest, first of all, I'll tell you we've all read the briefs. We're very familiar with the case. I would suggest that you focus your argument on the issues raised in the plaintiff's direct appeal. Okay? Are we ready? May I please have a quote? That comment sort of leaves me, and I had, frankly, intended to do a background a little bit about this process. And the court statements, maybe I should move on. We are very familiar with them. All right. Well, that gets rid of about the first six or seven pages of this outline. But the point is, I do want to summarize the initial arguments and then move on to the points. I'll leave out a lot of the background I was going to talk to the court about. At its essence, this case is about kickbacks. Defendants created agent programs, attorney agent programs, to disguise the fact that they were paying their attorney agents for referral of business, not for performing court-titled agent services. In reality, the defendants performed those services and then paid the line and share of the title insurance premiums to the attorney agents. Didn't one of the plaintiff's experts admit that the attorneys rendered some services and said an appropriate fee would be something in the neighborhood of 20% of the premium, not 50% or above? The attorney, the expert was Mr. Hopful. And when he discussed this, he was discussing this in the context of them providing some service that may be compensable under some other section of RASPA. And this, I think, this question is at the core of the dispute, Your Honor. And that, I say, is because really the issue comes down to an understanding of what court-titled agent services are and whether or not the attorney agents are required to perform all the court-titled agent services. Just as this court found in the first appeal. Well, if that's true, then that is something that the trial judge, after a lengthy trial, determined and came up with findings of fact and conclusions of law. And in order for you to prevail on something like that, you would have to say that her decision was unreasonable, arbitrary, or not based on the evidence. I mean, that's the standard of review that you're facing. No, I don't think so, Your Honor. Well, I know you would rather have it be de novo, but here's the reason why. We don't dispute her factual findings. If you look at paragraphs 8, 9, 10, 11 of her findings of fact, we're not disputing what she found. We're disputing the application of the definitions to her factual findings. So, if I understand your position, you don't dispute Judge McCliff's finding that the attorneys rendered actual, distinct, and necessary services. But your quarrel is with the fact that they didn't perform all court-titled services. Yeah. Getting down to what actually happened in the trial and what the evidence was, the only thing defendants can really point to that they did that wouldn't be in connection with their services for buyers or sellers in the transactions, duplicative of those services, is attending the closing and waiving exceptions. That's it. And that's the only thing they can really point to in this record. So, nobody else but an attorney agent can waive exceptions at closing. Actually, there are representatives of the title companies. And the title companies are there. And those attorney agents come to do that service, and they do it within the confines of direct guidelines established by the title companies. So, they're told exactly what they can and can't do at waiving exceptions. And they can't waive those exceptions unilaterally, can they? That's correct. They just have to get the title companies to do it. That's correct. They have to have direct permission to do it. That's right. And they can't do it on their own. So, that's the only thing. So, if you take the position that doing anything at all, So, whatever percentage that is, that that's it under the Thurman authority. If that's it, then, I mean, that's what the trial court did, and that's what she decided. We believe that the charge in this court was correct the first time around. And if you remember the court's ruling that none of those services were relevant so long as the attorney agents received a pro forma commitment. But that's based on your complaint. That's based on the information that was in front of the court at that time, which we had to assume is true while deciding whether or not the case should be sent back for class certification. That's what was decided. That was the mandate. It is sent back for class certification. It is, Your Honor, but it's also true that that is exactly what the Florida policy statement says with respect to quartile agent services and what Part 3500 of the HUD regulations say. Exactly the same thing. How is the Florida policy statement entitled to any more Chevron deference than the policy at issue in Freeman? Well, the policy in Freeman, of course, is a totally different policy. And what the U.S. Supreme Court dealt with in Freeman was whether or not the policy could expand given what the court deemed to be very clear language that more than one service provider was needed for there to be a division of fees or spread of fees. The 2001 policy statement that was at issue there clearly was in conflict with that. The 1996 policy statement is not at all in conflict with this. Not at all. So when Justice Scalia said RESPA is not a price control regulation. Absolutely. And we agree with that. We've never disputed that, nor have any of the federal courts. When Justice Scalia said that, that wasn't something new, Your Honor. The several federal courts, to my knowledge, every federal court could have dealt with it and already decided the same thing. RESPA is not a price control statute. And we're not pleading an overcharge case. What we're saying is that if you undertake in an agency agreement, and the evidence that was put in this record through the agency agreements of Mr. Orlowski and Mr. Coleman, dealing specifically with these two defendants, was that they were undertaking an ACA service. And the only service that would be applicable to that, I'm sorry, the only exemption, would be HC1B. Not HC2. So if you look specifically at those agreements, they were agreeing to do a core title agent services. Now the only way, the only way, that Judge Mika's decision can be affirmed, in our view, is if the court disregards Part 3500 of the HUD regulations on core title agent services. To my knowledge, no federal court or state court has ever disputed the legitimacy of that right. And ignores that way, and simultaneously ignores the perfectly consistent order policy statement, which takes the core title agent services and then defines the ambiguous term of what actual services are. What are actual services under HC1B? We have parties here, a very sophisticated defendant who believes that actual services can be, we send them the documents, we load them, they go through, we initial it, and that's it. They either do or don't send back a piece of paper originally. While the HUD regulations directly on point, and the illustration on point, says that is not the case. You either perform all those services, or you don't. And if you don't perform the services, and you effectively have the title company do them for you, then you are not legally entitled to that fee. Now, here's the problem, here's the rub on this case, because it sounds unfair. You say, well, wait a minute, we did something, shouldn't these guys get payment for something? HC2 is designed for that purpose. That's not our case, however. Our class definition is a definition where everybody got 100% of that fee division. 70 to 80% of this policy period, they got. And in those situations, if you wanted to pay them for doing something else than performing core title agent services, you could do that under HC2. And they didn't do it. HC2 would allow them, for example, to pay them to rent their office, to use the tax machine to do something else, or to appear and handle the closings, pay them $100 each to handle the closings. As long as that would be a separate lawsuit. That's not part of our case. And that's the point. And I think those two issues have been very, very carefully mixed up in this. And if you look at this issue as we go forward to discuss the application of the judgment order on March 1, 2013, with the judgment order, the final judgment order, it's argued that you cannot reconcile those two orders. It's impossible. Isn't the plaintiff's position on a field that the plaintiff should have been granted summary judgment? There was no need for a trial. Well, you know, I don't, I mean, what we're saying is that. Did you object to the thought or the specter of a trial? I mean, why'd you go through all the additional discovery after this case was sent back? We actually filed a motion for summary judgment. And the jury nodded that. Your argument here today is that that was the wrong ruling. You should have been entitled to summary judgment. No, I don't know that the answer to that question controls whether or not there were issues of fact. She said whether or not these pro formas, I'm sorry, these documents they sent were pro formas, she had to look at, see, and hear testimony about. She couldn't do it in a summary judgment context. Yeah, I think her exact words were that the court was not going to ignore whether or not there remained work to be done by the attorney agents following the receipt of an A exam or a preliminary commitment. That's why evidence needed to be heard. Well, actually, I don't dispute the reading from the record, but I dispute the fact, I think one thing she did say to us is that these, because they were cross motions for summary judgment, is that these issues needed to be aired out and she needed to hear testimony and there had to be a trial on that remaining issue. But your view of the trial was that we're not just going to hear evidence as to whether these attorneys did anything. We need to hear evidence that they performed all core title services. Our position was that the case was much simpler than what was tried. You're right. Our position is that you first of all identify whether or not the agreements were, were these attorneys hired to perform core title services? In other words, were they under these agreements? And the documents that were introduced in this case that are part of the record in this case clearly show that. They show that in Mr. Cohn's case, and that's JX27, that document, and in the other attorney agents is JX01.10. Those documents demonstrate that these were attorney agents in programs where they had hired these lawyers to perform core title services. Now, our view walking through this sequentially is that the core title agent services, you have to perform all of them. The most central part of that is that you have to make a determination of title insurability. If you look at her findings of fact, she absolutely determined that the title companies made the determinations of title insurability, not the attorney agents. So if they did not make those determinations, they could not be paid. Now, the question then came down to the argument over the Freeman v. Quicken decision and whether or not we see her doing anything at all, and that's what it came down to. Basically, the application of her approach would mean that if they did, if they showed up and did one dollar's worth of service, then that's it. Now, the case is over. Now, that doesn't make any sense at all, and it's not a fair reading of any of these rules and regulations, and I'll point out all of these are consistent. Every single one of these regs are consistent. There's no issue about deference here, and if you look at the Weatherman decision on deference, if you look at the Johnson v. Matrix out of this court on deference, they're dealing with policy statements of HUD, and we're talking about the difference between the deference that's afforded those policy statements and what the federal system would afford them. Yes, Your Honor. Okay. The Illinois statute requires that we pay attention to the regulations, and this 49398 is a federal regulation. So one could assume that under Illinois law, you have to pay attention to the definition of post-forma and all the other parts of 49398. How do you reconcile that the Illinois Department of Professional Regulations wasn't paying attention to that part of this law when they annually reviewed this program and said, oh, it's okay? Well, they didn't really do that. No, of course they didn't. Okay. I mean, as a matter of fact, in a bulletin, okay, in this case, that the bulletin that was issued by that organization you're talking about, it was issued in July, on July 9, 2005, and that bulletin very clearly said, and I'm quoting from it on page three of the bulletin, service companies and title insurance companies are not to send title insurance agents preliminary title commitments or other products which give the information to the title insurance agent in such a manner as to allow the title insurance agent to issue the commitment without having had to examine title and determine insurability of title. After the service company or title insurance company prepares the title commitment based exclusively on the title insurance agent's examination of the title, the prepared commitment must be returned to the title insurance agent to be reviewed. What bulletin is that? That bulletin is bulletin 1-05 and the exhibit number. I'll get for you in a second. Okay. But that exhibit number, that exhibit is directly on point for this letter. There's another later one that's 1-06. So when the defendants say the Department of Professional Regulations gave its annual approval to this program, that's not exactly true. Oh, no, anomalies are not true, but they terminated the program in September 2005 based on that. Both of these defendants terminated their programs based upon the fact that the Department of this regulation, regulatory body in Illinois, told them they had to stop what they were doing. Okay? They could not do it. And there's another one in February 23, 2006, that says basically the same thing, because even after they started their new programs, they were seeking to do the same thing. The idea here is very simple. It's from a policy standpoint. Most people who buy homes, one of the largest transactions they'll ever be involved in as a consumer in their lives, have no idea what title insurance is. They have no idea what it costs. They have no idea how to get it. And who do they talk to? They typically talk to a lawyer. The lawyer sends them to a title company, or doesn't even sell them, just orders the title insurance. When they do that, how does the title company market their services? Well, they go directly to the lawyer. Well, if you want to keep command of the market, how do you do this? Well, first of all, you make the work as little as it can possibly be, and you ramp the fee as high as you can make it. In this case, 70% to 80% of the premium for doing nothing. At Westbrook, it was designed to avoid exactly that. Now, Judge Smith is specifically saying that in the Tycor group of this class, the attorney agents didn't do anything. Is it possible to split out the Tycor group from the Schwaber Title group? Oh, sure. They were separate cases consolidated. But they didn't do anything. But if you look at the preliminary commitment that was issued here in the Chicago title case, you just take a look at it. In the case here, Mr. Corolla's case, there was no other document. In other words, that was the only document. So this is pro forma clause. It was the commitment they sent. It's the law. So the only way this is sustained is if you take the position that none of these cases are ever possibly maintainable because one of those titles means they perform all four title services. That means let's disregard Part 3500, the enabling regulation for Westbrook. You know, I never handled real estate cases, In your argument, you're saying that the lawyer, in order to be entitled to this payment, whatever you want to call it, has to perform all core services. Correct. What title company is going to allow title to be issued based on what a lawyer says with all of the core services? Which ones are going to do it? They're going to check it because they wouldn't trust the attorney agent to do it. And you're right. So if it comes back to them and they have to edit it and say, No, they didn't do it right here. We're going to lose money on this one, so we're going to change it. Now you've got the title company doing some of the core services. That would run afoul of your argument again. No, it doesn't, Your Honor. Because what you do is you don't do these programs and then cheat and give kickbacks. The RASPA has provisions for how you do this. You can pay them under 8C2 and do it right and according to law. Attorneys share fees in cases all the time when they do it. And some of them don't do anything other than pick up the phone and say, I represent this person. That's right, but there's rules that permit them to do it with full disclosure. They don't permit it to do that. Yes, unless the lawyer maintains professional responsibility. That's right. Exactly. And that's done, and it's done correctly. That's the difference. You can't do it in violation of the law because that makes it a kickback. And the whole purpose of this law was to protect consumers. The consumers don't know. There's not a single piece of paper in this record, one single piece of paper, to my knowledge, that shows that either of the two main claimants in the case signed any document acknowledging that there was a fee split in this case. They were paying these attorneys. So the bottom line is simply this, is if that is the core issue that you've raised, Justice Mason, and that particular issue we believe has been very, very carefully vetted in these briefs and we believe that you have to perform to be legally entitled to the full fee. Now, if you do some other service, which we're not disputing that they did. If Mr. Hoffel said they did some service, that wouldn't be this, where you get 70% to 80% of the entire time. The problem that I'm having, though, is even if we accept that, if we're looking at this de novo and we're sitting as if we were Judge Miklas, the three of us were three Judge Miklas, maybe we could come to that conclusion based upon the evidence. But once she has listened to everything, once she has, as the trial judge, processed everything, and once she has come out with her very detailed order making all of these findings going on for, I don't know, 20, 30 pages, in order for us to overturn that, we have to say that her decision was arbitrary, that her decision to the contrary of what you would want it to be is something that was not based on evidence. I don't know how we do that. Your Honor, I very much disagree with that analysis. And that's why I'm waiting to hear why. Because we're not disputing her findings of fact. What we're saying is that she incorrectly applied the law. She misread the policy statement, and she did not get deference. She gave deference in March on the summer judgment order to the Florida policy statement, went on at great length why she had deference, cited Freeman v. Crickin to distinguish one of their cases, and all that in the order, and then in the final order refused to give deference. Whether or not you give deference to these is not a factual inquiry. That's a legal inquiry. And the court can look at that and give deference to it. Whether or not cruel time-aging services are required to be followed, all of them is a legal read of Part 3500. So what we are to do is to take all of the fruits of the labor of the trial that are reflected in her order. Absolutely. And ferret out that one little narrow issue, and then we look at that de novo, and you can get her ruling based as if we were Judge McPherson in the trial court. We think that you can look at her findings of fact and correct her erroneous rulings of law, which we think have to be corrected because they cannot be reconciled with Part 3500 in the policy statement. And if you do, if you reconcile those, then her facts make this. Without doing the reward, you apply it, and that is a de novo review. We're not asking that you take her facts and change them or alter them or consider the record in any other way or say that she was wrong. We're not doing that. If I should comment about time to end, just raise your hand and I'll sit down, okay? All right. The Freeman case, Your Honor, you mentioned and referenced the question about that. That was a different policy statement, as you pointed out. And that policy statement, if you read it, by the way, has been the subject of significant other case law attacks and issues, that particular one. The 1996 policy statement that we're talking about here is perfectly consistent. The Freeman case is really a case to decide one single legal issue, and that legal issue was whether or not it takes two people under RESPA to divide a fee. That's the core issue that they decided. And when it came to the very end, Justice Scalia made the comment at the very end of the Freeman decision. He commented about excessiveness of fees and said this is not a price control statute, and we agree with that. We have not said that. If you look at all of the complaints in this case, we've never, ever said they overcharged. We're saying they're not legally entitled under this section, and the agreements they have are prepared under 8CA, and 8C1B is the correct exemption to apply which doesn't apply, because actual services under the former policy statement cannot give them coverage under that exemption if they haven't performed all the core title services and if they were sent a pro forma. So the differences with Freeman are that it was a case that truly was decided on a completely separate issue that is not involved in this litigation, and the Freeman case involved a completely separate policy statement that has nothing to do with this case. And the one thing that's interesting is if you look at the one part of that where at the very end of the case Justice Scalia says to take the petitioner's argument and turn it around, how absurd would it be to justify a $1,000 payment for a $1 worth of service? Now, he wasn't saying that that's what the law allows. He's saying that's absurd, and yet that's what happened here. Now, we're not saying, again, I'm repeating myself, we're not saying that that's the analysis. It isn't, but that's what the defendants asked the court to do, and that was incorrect in that process, unless the court has any further questions of me. That's all. Thank you. Thank you. Mr. Brody. Thank you, Judge. May it please the Court, Michael Brody on behalf of the defendants. Before I get into the guts of my argument, I'd like to address a couple of things that Mr. Tillery said by way of correction. Justice Pachinski, you asked about the Illinois regulations, and Mr. Tillery talked about Judge Mikva's findings. I think you may have misstated what Judge Mikva said. Her findings, and I refer to finding 28, is that during the class period, the Illinois Department of Financial and Professional Regulation used defendants' agent programs and found them to be in compliance with the regulations, with ITIA and RESPA. So not only was there testimony on this, the regulator testified, experts testified, but Judge Mikva made a finding that, in fact, we complied with the regulations, which is consistent with what the regulators did. In her summary judgment ruling, she ruled that the state claim went no broader than the federal claim, and that issue has not been appealed. So we think the Illinois issue doesn't bring in any greater liability, and there is none, than RESPA would. So that's the first correction. Second, you asked if, or suggested that, as to TICOR, Judge Mikva had made findings that there were no services provided. Mr. Tillery said, well, that's correct. That's not correct. Paragraph 21 of the factual finding starts, the attorney agents for both TICOR and Chicago title did such and such. Paragraph 22 says the attorney agents. At Paragraph 10, 11, 14 of her opinion, she describes the work done by both programs. In a moment, I'll explain the ways in which they diverged, but the statement that Mr. Tillery agreed with, that they performed no services, that's not correct. Okay. This case is about RESPA, which is a federal statute. All the claims in this case are based on RESPA. And in interpreting RESPA, the first place to look is the words of the statute, and the next place to look is what the United States Supreme Court has said about it. And Judge Mikva did precisely that, and her interpretations of law and her findings of fact should be affirmed in every regard. Let's start with the statute. RESPA, in all of its relevant sections, asks if the attorney agents, the people receiving compensation, performed services. That language is clear and unambiguous. Were services actually performed? In the first appeal, this court assumed that the attorney agents provided no services. It assumed that because that's what the plaintiffs alleged. They alleged there were no services, that the defendant title companies did everything. And based on that statement of a claim, based on those allegations, this court directed certification. We got beyond that, and we had a trial. And at that trial, plaintiffs didn't prove that case. They didn't prove there were no services. And, in fact, the evidence showed there were overwhelming services. I think it was Justice Mason who asked about Mr. Hopfield's testimony. Twenty to fifty percent of the value of services provided by the attorney agents. I think that's low. That was their expert trying to minimize what we did, and even he admitted that the attorney agents provided services. Mr. Tillery tried to dismiss that testimony and said, oh, that was in response to a different question. It wasn't. I commend you to the testimony, and we cite volume 66, page 588 in our brief. But a couple of pages later, I'm not sure if we cited this, but it's equally as clear, page 589 to 90. Judge Mitka followed up and said, let me get this straight. I'm going to ask a question that none of you are asking. You're all avoiding the important question. She says, subsequent to whatever the title company sent out, is there anything that you would do as an attorney agent? I'm now talking during the class period, she says. That you wouldn't do as a seller's attorney. So, in other words, are there any unique, non-duplicative services? They're witness. Yes, Your Honor. Yes, Your Honor. You would. I believe the attorney agent was expected to waive exceptions at the closing from the title commitment. So that would be a direct, direct, that would be a direct. In a direct ordering as an attorney for a seller, you would not have that function. Who is that? Pat, for real? The expert admits that our agents provided services. But what Mr. Tillery says is they waive exceptions only at the direction of the title company, but they don't independently make that determination. The title company has guidelines as to what the attorneys can do. If an attorney were to try to waive an exception where the exception shouldn't be waived, that would expose the title company to liability. The title company can't let the attorney agents make things up. So they have to follow the guidelines of what kinds of exceptions can be waived or not. But besides following the guidelines, they also have to get approval from the title company. Is that a correct statement? I don't think that's correct. There is a closer at the closing that participates in the closing and disperses the funds. But I believe the testimony at this case was the attorney exercises professional judgment. If the attorney is asked to waive an exception that the attorney can't waive or vice versa, that is a liability. If the title company does get final say on it? I don't think anyone, I think it's a situation where both professionals are involved, Your Honor. If the title company will not issue title based on what the attorney says, then there will be no transaction. If the attorney will not agree to waive an exception based on his or her professional judgment, there will be no transaction. So they both have the ability to exercise their professional judgment at the closing. And that's just one of the multitude of services that the attorneys provide throughout the process. And Judge Mikva found that the attorneys were involved in that critical issue of determination and insurability to the end. And that's what this focus on is the first step in the process. But there was a long process to follow, which Judge Mikva understood and discussed. Now, I mentioned Mr. Hoppe's testimony about 20 to 50%. Mr. Cohn, one of the attorney agents, also testified. And he said that in this case, in the transaction at issue here, he spent more time on the transaction than at his hourly rate he was paid for. So he provided more than 100% of the services. So the suggestion that this is a no-work program, that the services were duplicated and unnecessary, is contradicted by the facts of record and the factual findings by the trial judge, which cannot be assessed. Well, now, Mr. Tillery says, okay, we'll give you that the attorneys did something. They could be compensated under a different subsection of RESPA, but not under the attorney agent, based on the regs. How do you respond to that? Well, that's the all-or-nothing theory. The suggestion that unless the attorney agents provide all the services, they can't get the compensation they get. And first I look to the statute, which says, clearly, nothing in RESPA shall be construed to prohibit a payment for services actually performed. So the claim in this case that all the money paid to the attorney agents was wrong, plaintiffs lose on that claim. The Freeman decision, which interprets this language, makes clear that RESPA is not allowed to parse what the attorney agents can receive and what they can't receive. The Supreme Court in Freeman said RESPA is not ambiguous. It's not in need of any agency's interpretation. The language means what it means. It's clear. And HUD's attempts to impose some regulatory oversight on how that money is paid, the Supreme Court said is a palpable overreach. RESPA is not about price control. And it says if the party receives providing compensation provided any service, I said that wrong, party receiving compensation, performed any service, then there's no liability. The question the Supreme Court asked is, is it proper to share a fee with a party who did nothing? That's what the Supreme Court analyzed RESPA as providing. So in this case, we have access services, and that satisfies the statute. It satisfies Section 8B, which says the attorney agents can receive funds for services they perform. It satisfies Section 8C. All of the safe harbors speak to providing compensation for services actually performed. It's consistent with the testimony in this case. Plaintiff's expert, Mr. Mitchell, testified that the 8C2 exception applies to everything, and the courts have so held. Now, the plaintiffs argue the attorneys must provide every service to get any compensation. And the circuit court addressed that theory and concluded that that was inconsistent with the statute as long as services were provided. As I said, I believe that analysis begins and ends with Freeman, which permits payments to be made to attorney agents without a consideration of its overall fairness or value or reasonableness or all those terms, as long as services are being provided. And while we have conceded in the brief that Freeman deals with a different issue, it has holdings that are constructive in this case. RESPA is not ambiguous. 8B cannot be understood to prohibit unreasonably high fees. HUD's interpretation is an overreach. And the only question is whether the attorney agent, in this case the party receiving compensation, provided no services. And courts throughout the country have agreed. We cite the Howland case, which plaintiffs largely ignore. And it dealt with exactly the same claim as in this case. I believe the same plaintiffs' counsel were involved. And while it came up to the Seventh Circuit on a class certification issue, the court stated that this claim that you were paid too much, you didn't do all the services, therefore you can't get all the fees, doesn't support a per se claim under RESPA. And if anything, it would support a claim that would be so individualistic that you could never have a class. Howland speaks to this case. And it says either we lean on liability or the class has to be decertified. We cited the Hazelwood case. That case came up on a motion to dismiss. And the Eleventh Circuit said as long as the defendant's agents provided any service, and in that case the service was issuing the title insurance policy and selling the policy, as long as they did any service, there can be no claim. Motion to dismiss grants it as a matter of law. And we're aware of no contrary authority. No court has held that a court can disregard the services performed and assign liability on the theory of plaintiff's advance. And there were services performed. Plaintiff's expert, the attorneys in this case, the Chicago title and TICOR witnesses who explained how the programs work, the circuit court findings describe the involvement of the attorney agents in the title exam in the issuance of the commitment, in clearing and waiving exceptions, in determining insurability, in issuing the policy, attending the closing, keeping records, assuming liability. After the transaction, all those four title services, these attorney agents were involved. Now, plaintiffs focus a lot on the Florida State, and I'm going to spend some time on that and then briefly talk about the prior appeal in this case. The Florida Statement is a big source of plaintiff's claim. The Florida Statement is not a regulation. And here's what it says about the deference you should pay to it. I'm quoting the Florida Statement.  It's not dictating particular practices for title insurance companies and their agents. Okay. In the Florida Statement, HUD said, this is what we're going to do in Florida under Florida law, dealing with Florida practices, and we don't know what those practices were. But it's not going to dictate anyone's practices anywhere else. HUD said, we are not dictating practices for insurance companies and their agents. Okay. Plaintiffs would say, well, look to the regulations. Again, I refer you to Judge Mikva's finding of fact, where she said we are in compliance. So, the Florida Statement is not entitled to deference. Beyond that, the conduct of the defendants in this case, excuse me, the claims of the plaintiffs in this case under the Florida Statement are inconsistent with RESPA. The language of RESPA forecloses this position that a court can scrutinize how many services were provided here and how many were provided there. And Freeman forecloses that determination, too. Freeman makes clear that RESPA asks, were services actually performed? It's a binary question. If the answer is yes, there's no RESPA claim. If the answer is no, there may be a RESPA claim. RESPA and Freeman don't allow the claim that, well, services were performed, but they weren't enough. Services were performed, but they charged too much. They weren't reasonable. They should have been done in a different way. That kind of scrutiny into the services being performed is what Freeman and RESPA said we can't have. So, the Florida Statement and the regulation don't contradict the plain language of RESPA and the plain language of the cases interpreting it. But even if it did, even if the Florida Statement somehow applied, Judge Mikva made factual findings that the defendants complied with the Florida Statement. She outlined the four elements of the Florida Statement and said, as a matter of fact, that both High Court and Chicago Title complied with that statement. That's a question of fact that this Court cannot accept unless it's devoid of any evidentiary support. And there's plenty of evidentiary support for that. So, the Florida Statement we submit is an irrelevancy, but even if it applied, it wouldn't lead to a different result here. And then as to this Court's prior appeal, I don't think I need to spend much time on this. We addressed it in the briefs. But the prior ruling, as some of the panel's questions suggested, was based on assumed facts. And those assumed facts were that there were no services, that the defendants did everything, that the attorney agents did nothing. And that question we had trial on. And the Court ruled that that claim was not proved. Justice Mason, you suggested we not focus on the cross-appeal, and I won't, other than to say the cross-appeal argument dramatizes the difficulty with Plaintiff's claim, Plaintiff's liability claim. For even if you accept the idea that it is somehow a violation of a regulation or interpretive guidance of an administrative agency to do what we did, we're still left with the safe harbors of RESPA, which say that people can be compensated for the services they provided, which would mean that even if plaintiffs prevail, and they shouldn't, on their liability claim, we would then have to decide thousands of times, tens of thousands of times, hundreds of thousands of times, what services were provided in this case. In Mr. Cohn's representation, in Mr. Orlowski's representation, in each particular case, and that can't be certified, which is what the Holland Court ruled. There are no class issues, too. Does RESPA even apply? How do you determine damages? All those issues. I'll rest on a brief on those, but the fact that this is brought as a class action dramatizes the difficulty of Plaintiff's liability theory. There can't be a uniform claim on the theory they now pursue. Plaintiffs have had their day in court. They were given every opportunity to prove their case factually, and there's no complaint that Judge Mikva excluded evidence that the plaintiffs attempted to introduce or that there was any trial error. Plaintiffs could have tried to prove the claim they brought to the appellate court the last time, that is, there were no services, but that claim is contradicted by all of the evidence, including their evidence. So they're left with this new claim, that is that we have to provide every service in order to receive the compensation. That claim ignores the statute. It ignores Freeman, and it's inconsistent with the plain meaning of the statute and every case to interpret it. And finally, even if we accepted that claim and followed the Florida statement, the plaintiffs failed to prove their case as a matter of fact. So we invite the court to affirm Judge Mikva's reasoned opinion and to uphold the dismissal of this action. Thank you. So for the first half of the rebuttal, Mr. Smith? Yes, and I do intend to be brief, but I think I will be addressing a very important issue of the law of the case doctrine. Under the law of the case doctrine, a court's own reverse decision of law or fact settles that question for all subsequent stages of the litigation, and I know this court has indicated that this was up here on the pleadings, and I will get to that point. But the purpose of the law of the case doctrine is for the protection of the self-expectations of the parties. I'll get to that in more detail. When the U.S. Supreme Court intervenes, after the first appellate decision and before trial, and construes the very federal statute we're talking about, how can you ignore that? Well, I don't think you can. You look at it and you find out that Freeman is very different. They were interpreting 2607B, and they were interpreting a small portion, an important portion perhaps, but a small portion of 2607B, and they were looking at a separate type of policy. I heard this argument up here in which it was said that Justice Scalia had said this was a palpable overreach. Well, it may well have been on the 2001 policy statement, but it certainly wasn't addressing the 1996-4 policy statement in this case. You seem to be implying that after the first decision by this court that the case was sent back not only for class certification, but in effect just for what you're now looking for, an administrative determination of damages. Well, it is there. Let me point out the law of the case that this court laid out for us originally. They didn't go to the merits of the underlying action. What was the underlying action? The underlying action were the two questions they sent back. Can full payment be made? And was this a pro forma? And then said anything after that, if you prove that, that takes care of the controversy. They were then invited by the defendants in this case, who are fond of saying this was just here in the pleadings. They were then offered up testimony in deposition from administrators of both title companies as well as multiple affidavits from lawyers, and in the opinion, the court looked at it. This court looked at it. It says defendants note in assessing whether issues of common to the class over individual issues, the court may look beyond the pleadings, and then the court did. The defendants asked this court to look beyond the pleadings to the testimony of the various agents, as I just said, and that's what this court did. Ultimately, this court said defendant's argument is unavailing because what happened is they said we're not going to go at the underlying action and look, for example, at deference to be given to the HUD policy because that goes to the pro forma issue that's going back. But we are going to look at what's going to be relevant, what are the parameters of what we're supposed to be looking at. Well, that's law of the case. This court said you're not to be going there. You don't need to. H.C. 1B and H.C. 2 do not apply. Those exemptions simply don't apply, and that's law of the case. Context is everything. Yes. The issue was did the trial court err in denying class certification? The court, in the course of its opinion, the prior opinion of this court, did not decide the merits, did not decide the merits. It decided the parameters of the merits is what I'm saying. It also decided what exemptions, what law will apply, H.C. 1B and H.C. 2, will not apply on what we're sending back to you. This court told us what was going to be relevant and not. It couldn't be more clear than what the court said at that point. If the plaintiffs are able to prove, this court, that trial type was A exam and CTI's preliminary commitments are pro forma commitments and defendants cannot lawfully send their attorney agents pro forma commitments and pay them full compensation, they will prevail on their individual claims, meaning the class reps. But if that's the case and you get sent back to the trial court and the trial court says yes, the class can be certified and the trial court then grants summary judgment in favor of the plaintiffs, why was the trial not just on damages? Because the trial judge, she said throughout multiple times in transcripts for part of the record, I'm going to do this trial on a pro forma issue. But they kept continuing to push, we want to introduce evidence of individual activities. And she finally relented and said, and essentially allowed us, let's see for what it's worth. So she had a hearing on that and let them put that evidence in. But ultimately, from this court, that was not relevant to be taken in. I guess we couldn't completely convince her to follow this court then. I go back to my question to Mr. Tillery. What the plaintiffs are really saying is Judge Medford should have granted our motion for summary judgment and we should have had a trial on damages. Well, we should have gone back and presented the further details of what a pro forma is, have the deference applied that she ultimately did apply. She actually did the Chevron deference analysis in her summary judgment order and corrected itself and gave it deference. And then she diverted from it because of Freeman apparently. But Freeman is a different case. It's very different. It's talking about a single issue that HUD had a policy statement on. And that single issue was, can 2607B apply to a single provider? In other words, do they violate 2607B when it's just one party? No, we understand that it's completely different. Completely different, HUD. And that was the path of overreach that HUD had said, yes, one could be in violation. But when you talk about the law of the case and the granting of the partial summary judgment, and our questions are then why didn't you go directly to a trial on damages, what we're trying to suggest is that the court's ruling was interlocutory. I mean, if it weren't interlocutory, you know, that could have come up right at that point. Well, I understand it's interlocutory. I don't think that in any way means that neither party sought any review of that order at that time. I mean, there was no request for 304A language, anything like that, when the summary judgment was partially granted. I believe she declared we would have a hearing on this. I mean, I don't know how we could do it any more than provide a hearing, even though we disagreed with where she was going. I think she wanted to know more about this process. She found out more about the process. She said a number of times candidly that she didn't understand this whole process and thought we better have a hearing on this. I'm not at all clear that she decided that we were wrong on the factual underpinnings for a summary judgment in the first place. She gave us a hearing. She gave them a hearing. And we went forward on a hearing. We were entitled to this hearing. Okay, so there's a fundamental concept then. Do you think that the trial court is able, was able, to have a hearing and then come to decisions, factual determinations, that were in some measure contrary to what you believe she decided in the motion for partial summary judgment? I'm not sure. I can definitely follow up on that. Here's the thing. If her order is interlocutory and she has a subsequent hearing, is the court not allowed to make different factual determinations at the later time? I think she, I don't know that she ever made factual determinations at all the first time. Are you saying on the first summary judgment on the full payment? On your partial summary judgment that was granted? Yes. I don't think she ever, well, I guess she must have. I guess I'd have to say we were dealing with the fact that we had that summary judgment and actually, I'm sorry, in her second opinion. She said she was not changing at all what she said in her first opinion. She actually said at one point right after, shortly after closing argument, she said she felt she had made an error or made mistakes in the case and wondered what could be done. But at that point, that was well after the closing argument when we were hearing this. But she offered you the opportunity if you had other evidence to introduce. At that point, the definition of what we were doing there had been based upon the pro forma and what we'd done discovery on and all of that. I don't know. I suppose to this day I'm not sure what we could have provided. And Mr. Bieler may have a different thought. Right, because your position is these were pro forma. These were pro forma title commitments, and that's the end of the inquiry. That's the kind of position. That's right. And I guess I would say on the point of this interlocutory opinion, I don't believe it really matters a great deal at all how this went back and that for some reason this court's opinion can in some way be ignored. The guidance provided, the rulings provided can be ignored in our Supreme Court and claims Justice Freeman wrote. They spoke to a number of things here. Let me just go back to this a second. They argued a mandate rule and argued by that saying pretty much don't pay attention to anything else in this opinion. They would like to eliminate everything that was said by this court in that opinion. They then go on to say there were no further directions given, again trying to confine what occurred before. But Justice Freeman said when that occurs in clemency from a Supreme Court opinion, it is not required that a reviewing court state specific directions in an order reversing a judgment and remanding. In such a case, it is then the duty of the court to which the cause is remanded to examine the reviewing court's opinion and to proceed in conformity with the views expressed in it. So the mandate rule they argue, the decertification they argue, the law of the case that they all argue against is all about trying to allow what this court said would be irrelevant before. They're trying to put in all the individual activities and that wasn't supposed to be our trial, not according to what this court told us five years ago. Five years ago, the court told us exactly what we were supposed to do. You said that if we did prove those two things, the controversy is over. We will have proven our case, and we did exactly that. We went forward on that, and we don't question her fact finding. We're suggesting that the deference she gave it in the first place, the HUD policy statement, needs to be applied again here because Freeman doesn't interfere one bit with what's happened here. Completely different statement. If this court would not have certified the class years ago because attorneys work in beginning transactions, I think this is an important point. This court would not have certified the class if they thought any work that attorneys provided at some point after a pro forma is relevant here. You would not have certified this case if that were the situation. Let me allow Mr. Tillery to step up, and let's hear some questions from the court. Good. Thank you. A couple of points to respond to opposing counsel's comments. You asked, I think one of the questions was asked, was about the findings of the Illinois regulatory bodies. The person that was referenced, I think, in the findings by Judge Mikva was Harry Stormell, who was the former director of that, and he was hired as an expert witness by the defendants, and he testified. The only point I want to make in response to that is that you will see e-mails in this record and exhibits and regulatory statements and bulletins, all of which 100% answer your question about what the regulatory position was during this period. Judge Mikva found that the programs complied. She said her exact finding was, I think, that there was testimony that during this period it was, and that was based upon Mr. Stormell's statement in the record. So that's a finding that she made, and what you're suggesting is she made the wrong finding. All I'm saying in response is that when the court looks at this entire record, you'll see what I'm referencing. But you are suggesting that she made the wrong finding. I think on that point, to the extent that that represents any kind of a defense in this case to any matter of this proceeding, that applies in the face of all of the evidence in the case. That's all I'm saying. The bulletin that he issued in July of 2005 terminated these programs. It was his bulletin. He turned it in. And I did. So one other thing I wanted to talk about is this. There were questions about the applicability of a Florida policy statement and the scope of a Florida policy statement. And one of the questions was, or comments was, I think it was limited in scope. The truth is that the Florida policy statement itself is a regulation under HUD regulations if it is issued under a certain section, and that it was. And that particular section was met here because the Florida policy statement,  although the statement specifically addresses issues and practices that HUD reviewed in the state of Florida, its general principles may apply by analogy to other geographic and settlement service areas. In addition to that, continuing on under the Statement of Policy 1996-4, it says the purpose is to give guidance to interested members of the public on the application of RASPA and its implementing regulations to these issues, the Secretary pursuant to Section 19A of RASPA and CFR 3500. Now, why is that important? Because that makes it a regulation and that makes it effectively incorporated into the Illinois Title Insurance Act. That absolutely confirms that it cannot be ignored, as justice may predict, because it is a regulation, and at least under that section, it is incorporated. In addition to that, if you look at Exhibit 364, which is PX 364, planners introduced a settlement agreement in this case, and that settlement agreement was between Chicago Title and HUD during the class period. And in that settlement agreement, on page 3 of that exhibit, the agreements, Paragraph 2, Chicago Title, its officers, directors, and employees agree to comply with all provisions of RASPA, its implementing regulations, and HUD policy statements relating to RASPA. That was an agreement they reached during the class period. So to say that they can ignore this and disregard its application to this litigation is just simply not possible. But in one sense, you're asking us to ignore the entire trial that was conducted, because what you're asking us to do is to say that the judge was wrong in her legal determination, even though there were some facts involved in it too, and then to reverse the trial judge on that and send it back for an administrative determination of damages. That's the relief you're requesting. It is. And the bottom line is this, is what we want this court to do, is to look specifically at whether or not the policy statement applies and whether court title agent services apply. No one, I must reaffirm this, no one has disputed that Part 3500, the enabling regulations are applicable, are valid. No federal court, no state court anywhere in the country has ever done that. They define court title services. That court title service definition is at odds with what's happened here. It just cannot be reconciled with this resolution. And if you go one step further and look at the part of the policy statement, it absolutely says it's for pro forma assent that can't be paid under this section. That's it. I mean, is that a difficult promise? There are lots of places in the world where per se issues occur with respect to violations, with statutory violations, and in this case you cannot pay them because it's a piece of legislation designed to avoid exactly these problems, and that is what's happened. Now, one of the things that was asked is whether or not these attorneys can waive exceptions. That's really, you heard references to all these things they do. They get paid for doing those things by the sellers and the buyers who hire them. And the testimony in this case came down to ultimately, you heard the question, the one question that I think Judge Mitka asked, or was it? They do this, the only thing anybody could ever come up with that they weren't otherwise being paid for was to close, to waive exceptions. That was it. In this month-long trial, that was the end of this case. They waived exceptions. Well, let's look at what their own witnesses said on that in that issue, and let's look at the trial testimony of Mary Richter. Now, who is she? She's a Chicago title insurance company closer, File 66, 00695, and 00701-702. Here's what she says. Can an attorney, could an attorney agent during the class period just waive whatever exceptions he wanted so the transaction could close? No, he could not. Why not? There are guidelines that he needed to follow in the agency program so that he did not have a rubber stamp to just waive anything and everything without proper clearance. He didn't have cart wash authority? No. To do whatever he wanted? He did not. What if an attorney agent wanted to clear a $350,000 mortgage as paid in full based on a handwritten note? Could he waive that exception? He could not. Why not? Because it's an unacceptable requirement under the guidelines, and if he tried to, we would escalate it up to an underwriter for him to deal with. Let's go to Chicago Title. This is the testimony of Dale Maher, Volume 67, 008805. Now, Title had underwriting guidelines that everyone was required to follow, right? Correct. Attorney agents were required to follow those? Yes. And non-attorney agents were required to follow those? Yes. Correct. Attorney agents didn't have the power, for example, to create or approve endorsements on their own, did they? No. They had to follow those guidelines. You'd have to look to the lender's instructions for those. Correct. And attorney agents were not free to waive items at closing unless they gave you the proper clearance material. Correct. You wouldn't allow them to waive things unless they gave you the material, right? Pardon me? You wouldn't allow them to waive anything unless they gave you clearance material. They had to follow our underwriting guidelines, so yes. And in non-attorney agent transactions, I think you testified the attorney was provided with the same clearance material, the same documents, the same documentation, yes. Now, that is the only thing they claim that was separately legally compensable in this case. The only thing, and you just heard from their witnesses, that it was a sham to begin with. Okay, I'll ask you to wrap up, Mr. Tillery. All right. I'm sorry, Lana. Thank you very much. You'd be sorry for us. Well, I spoke to them. No, you didn't. No problem. Thanks. Thank you. All right. Thank you for excellent arguments, very thorough and very interesting briefs. We'll take the matter under advisement.